No. 22-6012

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Jane Doe,

Plaintiff–Appellant,

v.

University of Kentucky,

Defendant–Appellee.

On Appeal from a Final Judgment of the
United States District Court for the Eastern District of Kentucky
Case No. 5:15-cv-296, Hon. Joseph M. Hood

## BRIEF OF *AMICI CURIAE* CIVIL RIGHTS AND SURIVOR ADVOCACY ORGANIZATIONS IN SUPPORT OF APPELLANT JANE DOE

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Sean Ouellette
Adele Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net
akimmel@publicjustice.net

Counsel for *Amici Curiae*

Feb. 28, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no *amicus* has a parent corporation, is owned in whole or in part by any publicly-held corporation, or is itself a publicly-held company.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ i

Table of Authorities ............................................................................... iii

Interests of *Amici Curiae* ....................................................................... 1

Introduction and Summary of Argument ..................................................... 2

Argument ............................................................................................ 5

I.    Title IX Prohibits Retaliation Against Students Who Withdraw from
      School Because of Sexual Harassment ............................................... 5

      A.    Title IX's text and legislative history, as well as Supreme Court
            precedent, broadly bar retaliation by federally-funded schools ............... 5

      B.    The District Court's judicially implied limits on Title IX's scope
            undercut the statute's "broad remedial purposes" ............................. 10

      C.    Sixth Circuit precedent supports Appellant's position ......................... 12

II.   Even If Title IX Limited Its Protections to Those Who "Participate" in
      a School's Educational Programs, the Title IX Process Would Qualify ........ 16

      A.    A school's Title IX process is an educational activity ......................... 16

      B.    Holding that Title IX permits retaliation during the Title IX
            process would turn the statutory scheme against itself ........................ 17

      C.    The systemic effects of sex-based discrimination counsel against
            a narrow definition of "education program or activity" ........................ 18

III.  The District Court's Error Permitted the University to Take Actions
      that Would Dissuade Students from Filing Complaints .......................... 21

Conclusion ........................................................................................ 24

Certificates ....................................................................................... 25

Appendix of *Amici Curiae* ...................................................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bose v. Bea*,
   947 F.3d 983 (6th Cir. 2020) ............................................................ 12

*Burlington N. & Santa Fe Ry. v. White*,
   548 U.S. 53 (2006) ................................................................ 13, 21, 23

*Cannon v. Univ. of Chicago*,
   441 U.S. 677 (1979) ......................................................................... 10

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629, 630 (1999) ...................................................... 15, 17, 18

*Doe v. Claiborne Cnty. Bd. of Educ.*,
   103 F.3d 495 (6th Cir. 1996) .............................................................. 7

*Doe v. Mercy Cath. Med. Ctr.*,
   850 F.3d 545 (3d Cir. 2017) ............................................................... 6

*Doe v. Oberlin Coll.*,
   963 F.3d 580 (6th Cir. 2020) ............................................................ 16

*E.E.O.C. v. SunDance Rehab. Corp.*,
   466 F.3d 490 (6th Cir. 2006) ............................................................ 14

*Farmer v. Kansas State Univ.*,
   918 F.3d 1094 (10th Cir. 2019) ........................................................ 19

*Feminist Majority Found. v. Hurley*,
   911 F.3d 674 (4th Cir. 2018) ...................................................... 20, 21

*Fuhr v. Hazel Park Sch. Dist.*,
   710 F.3d 668 (6th Cir. 2013), *overruled on other grounds*, *Univ. of Tex. Sw.
   Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .................................... 12, 21

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ........................................................................ 18

*Gordon v. Traverse City Area Pub. Schs.*,
   686 F. App'x 315 (6th Cir. 2017) ..................................................... 12

*Goss v. Lopez*,
   419 U.S. 565 (1975) ..................................................................... 5, 17

*Grove City College v. Bell*,
   465 U.S. 555 (1984) .......................................................................... 8

*Horner v. Ky. High Sch. Athletic Ass'n*,
   43 F.3d 265 (6th Cir. 1994) ............................................................... 7

*Ingraham v. Wright*,
   430 U.S. 651 (1977) ........................................................................ 17

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ................................................................. passim

*Jeldness v. Pearce*,
   30 F.3d 1220 (9th Cir. 1994) ............................................................. 6

*Mahanoy Area Sch. Dist. v. B.L.*,
   141 S. Ct. 2038 (2021) .................................................................... 19

*Michigan Flyer LLC v. Wayne Cnty. Airport Auth.*,
   860 F.3d 425 (6th Cir. 2017) ............................................................. 5

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982) ....................................................................... 6, 7

*Nat. Collegiate Athletic Ass'n v. Smith*,
   525 U.S. 459 (1999) .......................................................................... 8

# TABLE OF AUTHORITIES—continued

**Page(s)**

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ................................................... 17

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    633 F.3d 81 (2d Cir. 2011) ........................................ 16

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .................................................. 13

*Simpson v. Univ. of Colo. Boulder*,
    500 F.3d 1170 (10th Cir. 2007) ............................... 20

*Snyder-Hill v. Ohio State Univ.*,
    48 F.4th 686 (6th Cir. 2022) ........................... passim

*United States v. Grossi*,
    143 F.3d 348 (7th Cir. 1998) ...................................... 7

*Watford v. Jefferson Cnty. Pub. Sch.*,
    870 F.3d 448 (6th Cir. 2017) ....................... 3, 14, 21, 22

*Weckhorst v. Kan. State Univ.*,
    241 F.Supp.3d 1154 (D. Kan. 2017), *aff'd* 918 F.3d 1094 (10th Cir. 2019) ...... 20

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) ............................... 23

**Statutes**

20 U.S.C. § 1681(a) ...................................... 4, 5, 6, 15

20 U.S.C. § 1681(a)(1)–(9) ................................... 6

20 U.S.C. § 1687 .................................................. 15

# TABLE OF AUTHORITIES—continued

**Page(s)**

20 U.S.C. § 1687(2)(A) ................................................................ 5, 7, 16

## Other Authorities

117 Cong. Rec. 39251-52 (1971) (remarks of Rep. Mink) ...................................... 9

C.P. Smith and J. J. Freyd, Institutional Betrayal, American Psychologist 575 (Sept. 2014) .................................................................................... 22

H.R. Rep. 98-829 ....................................................................................... 8

Know Your IX, The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout (2021) ................................................ 10

Ltr. from J.L. Herman to S. Goldberg, Assistant Sec'y for Civil Rights, Dep't of Educ. (Jan. 25, 2019) ............................................................................. 22

S. Rep. 100-64, 1988 U.S.C.C.A.N. 3 (Jun. 5, 1987) ..................................... passim

U.S. Dep't of Educ., Final Rule, 45 Fed. Reg. 30939 (May 9, 1980) ................... 18

U.S. Dep't of Educ., Final Rule, 85 Fed. Reg. 30043 (May 19, 2020) ................. 22

U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment (Updated July 28, 2022) ....................................................... 19

U.S. Dep't of Justice, Title IX Legal Manual (Aug. 12, 2021) ......................... 7, 8

Univ. of Ky. Reg. 6:2 §§ II, VII, IX ...................................................... 22

## Regulations

34 C.F.R. § 100.7(e) ............................................................................. 11

34 C.F.R. § 106.71 ............................................................................... 16

## INTERESTS OF *AMICI CURIAE*

*Amici* are civil rights and survivor advocacy organizations that work to promote sex equality and safety in education. They litigate Title IX cases on behalf of survivors of sex-based violence and/or advocate for policies that benefit student-victims. From their significant experience, *amici* recognize that judicial enforcement of Title IX that is consistent with the statute's full breadth and promise is crucial to ensuring student survivors of sexual assault receive the support they need to learn in the wake of violence. *Amici* have a particular interest in ensuring that student survivors of sexual assault are able to access their schools' Title IX processes without fear of retaliation. They represent clients who have relied on those processes to secure access to educational opportunities following a sexual assault. Further information about *amici* and their interests in this case is available in the Appendix.

Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici*'s counsel authored this brief, no party's counsel authored the brief in whole or in part, and no party beyond *amici* contributed any money toward the brief. The parties to the case have consented to *amici* filing this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *Jackson v. Birmingham Board of Education*, the Supreme Court held that "when a funding recipient retaliates against a person *because* he complains of sex-discrimination," it violates Title IX. 544 U.S. 167, 173 (2005) (emphasis in original). The District Court disagreed. It held that Title IX allows schools to retaliate against students for filing Title IX complaints in federal court as long as the student no longer attends the school. The District Court believed this was true even where the plaintiff dropped out of school *because* of the way the school handled her rape complaint. The District Court's ruling directly contradicts the plain text of Title IX and Supreme Court precedent. It licenses universities to retaliate against former students to prevent them from challenging gender-based exclusions or expulsions, ruptures Title IX's remedial scheme, and chills access to the federal courts. It should be reversed.

In 2014, a University of Kentucky student raped Jane Doe in her dorm on campus. After *three* hearings—all of which found that the assailant had raped her but were thrown out on internal appeal—the stress made Jane unable to continue her studies, and she left the school entirely. *See* Appellant Br. at 3 n.2, 13-14.[1] When

---

[1] At the time of the assault, Doe was enrolled at Bluegrass Community and Technical College ("BCTC"), an entity owned and managed by the University. Appellant's Br. at 3 n.2. She withdrew in October 2014 and re-enrolled at another BCTC campus in 2015. *Id.* In August 2015, after the appeals panel reversed the third hearing's result, Jane dropped out of BCTC entirely. R. 151 at 2533.

Jane sued the University under Title IX, it promptly turned against her. It delayed the fourth hearing for 15 months (citing the lawsuit), disregarded first-hand reports that its Chief of Police kept a critical witness from testifying, violated several policies at the fourth hearing, and reversed its previous three findings, concluding her assailant was "not responsible" for raping Jane. *See id.* at 13-14.

If Jane were a school employee, the District Court would have easily found, as precedent requires, that the University's post-suit conduct—delaying her grievance proceeding then rejecting her complaint because of her lawsuit (as a jury could reasonably conclude)—was unlawful retaliation. *See Watford v. Jefferson Cnty. Pub. Sch.*, 870 F.3d 448, 450 (6th Cir. 2017) (delaying or ending post-termination grievance procedure because employee filed a complaint is an "adverse employment action" even where the plaintiff is no longer employed by the defendant).

Instead, the District Court held that Doe's retaliation claim failed as a matter of law. First, the Court held that Title IX did not protect Jane because she had left the University before it retaliated against her. In the Court's view, this was because Title IX only prohibits retaliation against those who "reside[ ] in the University" or "participate[ ] in [ ] school-related functions." R. 151 at 2540. Second, the Court held that Title IX did not cover acts within the school's Title IX process because,

3

even if retaliatory, they were not "school-related." *Id.* The Court cited no support for these limits on the scope of Title IX's coverage, *see id.*, and indeed there is none.

Just the opposite. ***First***, Title IX protects every "person" from "sex discrimination by recipients of federal education funding." *Jackson*, 544 U.S. at 173. Its "beneficiaries plainly include all those who are subjected to 'discrimination' 'on the basis of sex,'" not just current students. *Id.* at 179 n.3. And it applies to "all the operations" of a university, not just "traditional educational operations." S. Rep. 100-64, *16, 1988 U.S.C.C.A.N. 3, *18 (Jun. 5, 1987); *see* 20 U.S.C. § 1687(2)(A). Congress and the Supreme Court have repeatedly urged courts to read the statute broadly. *See* Section I.A. *infra*. But it does not take a broad reading to conclude that "retaliation against individuals because they complain of sex discrimination … violates the clear terms of the statute." *Jackson*, 544 U.S. at 183. No matter who the "individuals" are or in what form the school chooses to punish them. *See id.* at 179 n.3. Title IX does not forbid a school from punishing a sexual harassment complainant with an F in class only to permit it to retaliate with brick through the complainant's living room window.

***Second***, even if Title IX's protections were limited to those who currently "participate" in its educational programs, they clearly apply to individuals participating in a university's Title IX adjudication process. That process is part of a university's "education programs or activities," 20 U.S.C. § 1681(a), because it is

4

part of the university's "operations." *Id.* § 1687(2)(A). Indeed, a school's disciplinary process is a core "educational device." *Goss v. Lopez*, 419 U.S. 565, 580 (1975). So, even if Title IX only prohibited "school-related" retaliation, a school's use of its own disciplinary process to retaliate for a complaint against the school is plainly a "school-related" action. This Court has repeatedly held that Title IX prohibits schools from using their internal Title IX process to discriminate based on sex. *See* Section II.A, *infra* (citing cases). And it has applied the statute to "non-students and non-employees," including contract referees and campus visitors who tour the school's athletic facilities. *See Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022). If mere visitors can rely on Title IX's protection, this Court should not expose former-student complainants to its weaponization.

## ARGUMENT

### I.    Title IX Prohibits Retaliation Against Students Who Withdraw from School Because of Sexual Harassment

#### A.    Title IX's text and legislative history, as well as Supreme Court precedent, broadly bar retaliation by federally-funded schools

Statutory interpretation starts with the text. *Michigan Flyer LLC v. Wayne Cnty. Airport Auth.*, 860 F.3d 425, 428 (6th Cir. 2017). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The

Supreme Court has repeatedly stressed that courts "must accord" Title IX "a sweep as broad as its language." *Jackson*, 544 U.S. at 173 (quoting *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521 (1982)). And Congress has repeatedly instructed courts to give that language "the broadest interpretation" possible. S. Rep. 100-64, *7, 1988 U.S.C.C.A.N. 3, *9 (Jun. 5, 1987). Read through this lens, Title IX's scope is expansive: it "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" *Jackson*, 544 U.S. at 173.

As "a broadly written general prohibition on discrimination, followed by specific, narrow exceptions," Title IX does not permit courts to create their own *implied* exceptions for classes of people or methods of discrimination. *See id.* at 175; *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 555 (3d Cir. 2017) ("Congress expressly exempted specific kinds of programs from Title IX's reach—like military academies, religious schools, and sororities, *see* 20 U.S.C. § 1681(a)(1)–(9)—so we're hesitant to impose further restrictions without strong justifications from Title IX's text."); *Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (Because § 1681(a) lists specific exemptions, others are not to be "judicially implied.").

In fact, § 1681(a) expressly rejects the exceptions the District Court imposed. First, the plain text applies to any "person": it does not limit Title IX's protections to students, residents, or those who "participate" in "school-related functions," as the District Court assumed. "Congress easily could have substituted 'student' or

6

'beneficiary' for the word 'person' if it had wished to restrict the scope of" the statute; but it did not. *N. Haven,* 456 U.S. at 521. It follows that "Title IX's beneficiaries plainly include all those who are subjected to 'discrimination' 'on the basis of sex.'" *Jackson*, 544 U.S. at 180 n.3. Not just students and teachers.

Second, through the Civil Rights Restoration Act of 1987 ("CRRA"), Congress amended Title IX to clarify that the phrase "program or activity" means "all the operations" of "a college, university, or other postsecondary institution." 20 U.S.C. § 1687(2)(A). These words "make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994); *accord Doe v. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 513 (6th Cir. 1996) (the CRRA gives Title IX an "institution-wide application" to schools); *United States v. Grossi*, 143 F.3d 348, 350 (7th Cir. 1998) (the CRRA "amended Title IX to require the entire entity receiving federal funds to abide by the statute's substantive rules").

The CRRA's legislative history confirms that Title IX covers all the University's actions. Per the Senate Report: "when federal financial assistance is extended to any part of a college, university, other postsecondary institution, or public system of higher education, *all of the operations of the institution* or education system are covered." S. Rep. 100-64, *7, *16 (emphasis added); *see also* U.S. Dep't of Justice, Title IX Legal Manual § III.C (Aug. 12, 2021), *available at*

https://www.justice.gov/crt/title-ix#8 (accessed Feb. 23, 2023) ("[I]t is well established that the covered education program or activity encompasses *all* of the educational institution's operations.").[2] Congress thus sought to correct past judicial decisions that made the same error the court did below—cases that incorrectly limited Title IX's coverage to specific educational programs or activities within the institution. *See Nat. Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 n.4 (1999) ("Congress enacted the CRRA in response to Part III of our decision in *Grove City College v. Bell*, 465 U.S. 555, 570-574 (1984), which concluded that Title IX, as originally enacted, covered only the specific program receiving federal funding."). In passing the CRRA, then, Congress deliberately gave schools a choice to "practice

---

[2] That Title IX applies to "all of the operations" of a traditional educational institution does not mean that the word "education" (used to modify "programs or activities" in § 1681(a)) is superfluous. The word still does work. It ensures that entities whose primary function is non-educational—like state agencies or private hospitals that accept funds for discrete educational programs or activities—are not required to bring all of their substantially non-education functions into compliance. *See* S. Rep. 100-64, *17; U.S. Dep't of Justice, Title IX Legal Manual § III.C (Aug. 12, 2021) ("*[O]utside the context of traditional educational institutions,* a fact-specific inquiry is required to determine which portions of a covered program or activity are educational, and thus covered by Title IX." (emphasis added)). But for universities and colleges—clearly "educational institutions"—the modifier simply describes all of their operations. *See id.* n.28 ("If the recipient does have education as its primary purpose, such as colleges, [and] universities, … then the federal funds result in institution-wide coverage. If the entity receiving federal funds does not have education as a primary purpose yet engages in educational functions, then all of its education-related functions are covered." (quoting H.R. Rep. 98-829, *27)).

equality or not come to Federal Government for financial support." S. Rep. 100-64, *6 (quoting 117 Cong. Rec. 39251-52 (1971) (remarks of Rep. Mink)).

The upshot is simple: "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson*, 544 U.S. at 173. Period.

These principles apply equally to retaliation. In *Jackson*, the Supreme Court established the rule that governs this case: "when a funding recipient retaliates against a person because he complains of sex-discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." 544 U.S. at 174. *Jackson* held that a non-student—a former high school basketball coach— could state a Title IX claim if he pled that the school fired him because he complained about sex discrimination against the girls' basketball team. *Id.* at 184. In doing so, the Court specifically rejected the notion (urged by the dissent) that Title IX limits the "class of people the statute protects" against discrimination by a recipient. *Id.* at 179 n.3. Title IX "protects *all* those who are subjected to 'discrimination' 'on the basis of sex,'" the Court held, so "the statute clearly protects those who suffer retaliation." *Id.* (emphasis added). Nowhere did the Court cabin this rule to exclude certain victims (such as those who no longer "participate[ ] in … school related functions," R. 151 at 2540) or qualify that retaliation only counts if it affects the victim's education. Yet that it exactly what the District Court did below.

9

**B.      The District Court's judicially implied limits on Title IX's scope undercut the statute's "broad remedial purpose"**

In exposing former students to unchecked retaliation, the District Court's ruling also kneecaps the statute's twin purposes: "to prevent the use of federal dollars to support discriminatory practices" and "'to provide individual citizens effective protection against those practices.'" *Jackson*, 544 U.S. at 180 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)); *see also*, *e.g.*, *Snyder-Hill*, 48 F.4th at 699, 708 (rejecting limitations on Title IX's scope, including the definition of education "program[s] and activit[ies]," in light of Title IX's "broad remedial purpose"). In *Jackson*, the Court made clear that broad protections against retaliation are integral to Title's IX's goals and to its entire enforcement scheme. Its dual aims "would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." *Jackson*, 544 U.S. at 181. "Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied." *Id.*

These concerns apply with equal force to student victims who leave school due to harassment and to those who remain. More than half the students who experience sexual violence at college take a leave of absence, transfer to another university, or drop out entirely. *See* Know Your IX, The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout (2021)

(finding 27% of such students take a leave of absence, 20% transfer, and 10% drop out). Exposing these victims to retaliation if they report the discrimination that forced them out would leave a massive gap in Title IX's enforcement scheme, which "depends on individual reporting." *Jackson*, 544 U.S. at 181. Schools that expel students based on their sex could freely retaliate to discourage a lawsuit later. Schools could force students out by ignoring or mishandling complaints of abuse, as the University did here, then silence them. They could condition readmission on dismissal of Title IX suits. They could disparage students to employers, blackball them at other institutions, or engage in blatant intimidation—all using taxpayer funds, and all without recourse under Title IX. Congress plainly did not intend this result.

Were there any room for doubt, federal regulations dispel it. They provide that no recipient "shall intimidate, threaten, coerce, or discriminate against ***any individual*** … because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e) (emphasis added). These regulations "have been on the books for nearly 30 years," and they confirm that schools are not "free to retaliate against those who reported sex discrimination" once they leave the school. *Jackson*, 544 U.S. at 183.

11

### C.    Sixth Circuit precedent supports Appellant's position

In holding that Title IX permits universities to retaliate against students who have left school, the District Court relied on dicta from two cases stating that a plaintiff must show an "adverse *school-related* action" to sustain a claim for retaliation under Title IX. *See* R. 151 at 2448-50 (emphasis added). But neither case applied the term nor explained what the court meant by it; they affirmed on other grounds. *See Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (not disputing that plaintiff suffered an adverse action; affirming based on lack of causation); *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017) (affirming based on plaintiff's failure to produce evidence that actions were "severe enough to dissuade a 'reasonable person' from engaging in the protected activity"). This Court appears to have used the term as a substitute for the term "adverse *employment* action" used in Title VII cases. *Gordon*, 686 F. App'x at 320 (repurposing the Title VII retaliation standard from *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), *overruled on other grounds*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), and replacing the word "employment" with "school-related").

In other words, this Court's standard for Title IX retaliation tracks its standard for retaliation under Title VII. *See Gordon*, 686 F. App'x at 320; *Fuhr*, 710 F.3d at 673 n.2 ("Title IX retaliation claims are analyzed using the same standards as Title VII. … Therefore, [for claims under Title IX,] it suffices to state the

standards articulated in Title VII cases."). This confirms that Title IX prohibits retaliation against former students after they leave school. Retaliation against former employees violates Title VII even though Title VII's text more narrowly applies to "employees" (while Title IX applies more broadly to any "person"). *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (former employee could state retaliation claim based on post-discharge negative reference). This makes sense because "exclusion of former employees from the protection of [Title VII] would undermine the effectiveness of Title VII by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining …. and would provide a perverse incentive for employers to fire employees who might bring Title VII claims." *Id.* Similarly, Title VII's anti-retaliation mandate does not merely prohibit "employment-related actions" because "employers can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63-64 (2006) (emphasis in original). So, too, for former students under Title IX: a school may effectively retaliate by taking actions not directly related to their education or by causing harm outside school. *See* Section I.B *supra*.

This Court's Title VII precedents confirm that the University's actions constitute retaliation under the standards applicable to both statutes. In *Watford*, this Court held that a school district engaged in retaliation when it delayed a former

employee's internal grievance proceeding because she filed a discrimination complaint with the EEOC. 870 F.3d at 450; *see also E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 497 (6th Cir. 2006) (holding previously that "terminating an in-house grievance proceeding because the employee filed an EEOC charge 'clearly constituted retaliation'"). Even though the plaintiff was no longer an employee, the employer deprived her of the benefits of a prompt and effective grievance process based on her EEOC charge. *See Watford*, 870 F.3d at 454. The same reasoning applies here, where the University delayed Jane Doe's university Title IX proceeding and ultimately rejected her complaint because she filed suit under Title IX.

Finally, this Court has confirmed "that a non-student and non-employee can bring a Title IX claim." *Snyder-Hill*, 48 F.4th at 708. In *Snyder-Hill*, the court held that a contract referee at a school sporting event and a high school student visiting campus stated a Title IX claim against a university for deliberate indifference to sexual harassment that occurred during their brief visits. *Id.* If Title IX protects a contractor working at a sporting event and a high school student visiting campus for a tour, then it certainly covers a former student who initiates and testifies in Title IX proceeding about her on-campus rape. The court in *Snyder-Hill* reached its conclusion because the plaintiffs were harassed by a third party "while participating, or at least attempting to participate, in the funding recipient's education program or

activity," "defined broadly." *Id.* Jane Doe was, too—even after she left her program, she was still participating in the University's Title IX process. *See* Section II.A *infra*.

Here, however, that is beside the point: this Court has never required that a student "participate" in a school-related function for Title IX to protect her against a university's *direct* discrimination or retaliation. The "participation" requirement makes sense when (as in *Snyder-Hill*) a plaintiff seeks to hold a school liable for its failure to correct discrimination by a third party; in such cases, to show the discrimination "occur[red] 'under' 'the operations of' [the] recipient, 20 U.S.C. §§ 1681(a), 1687," the plaintiff must show "the harassment [took] place in a context subject to the school district's control." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999). But a school's *own* discrimination or retaliation is *always* subject to the school's control. As the Supreme Court observed in *Jackson*, "retaliation presents an … easier case than deliberate indifference. It is easily attributable to the funding recipient, and it is always—by definition—intentional." 544 U.S. at 183. So, a recipient's "retaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of the statute.'" *Id.* This Court should not limit this prohibition with an exception the Supreme Court eschewed in *Jackson*.

## II.     Even If Title IX Limited Its Protections to Those Who "Participate" in a School's Educational Programs, the Title IX Process Would Qualify

Even if it were correct that a person must "participate" in a "school-related function" to invoke Title IX's protection, a school's Title IX process fits the bill.

### A.     A school's Title IX process is an educational activity

As discussed, an "'education program or activity' is defined broadly" in Title IX and the CRRA, *Snyder-Hill*, 48 F.4th at 708, to include "all the operations" of a school that receives federal funds. 20 U.S.C. § 1687(2)(A); *see* Section I.A *supra*. It includes not only "traditional educational operations," but also "faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore," and even the institution's "commercial activities." S. Rep. 100-64, *17. It also covers "situations in which individuals are, for example, accessing university libraries or other resources, or attending campus tours, sporting events, or other activities." *Snyder-Hill*, 48 F.4th at 708. A school Title IX proceeding certainly falls within this broad definition. Indeed, federal Title IX retaliation regulations explicitly apply to the use of a school disciplinary process to retaliate against a complainant. 34 C.F.R. § 106.71 ("[C]harges against an individual for code of conduct violations … for the purpose of interfering with any right or privilege secured by Title IX … constitutes retaliation"). And this Court has confirmed that Title IX prohibits the use of a school's "disciplinary proceeding" to discriminate based on sex. *See, e.g., Doe v. Oberlin Coll.,* 963 F.3d 580, 586 (6th Cir. 2020); *see also Papelino v. Albany Coll.*

*of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (reasonable jury could find that school's mere "initiation" of disciplinary proceedings was retaliation).

The District Court's premise that a Title IX grievance process is not an "educational" or "school-related" function also flies in the face of decades of Supreme Court jurisprudence. In *Davis*, the Supreme Court instructed courts to "refrain from second-guessing the disciplinary decisions made by school administrators," 526 U.S. at 648, because they reflect "judgment[s] on the part of school officials" about how to maintain a "proper educational environment." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.9 (1985) (cited in *Davis*, 26 U.S. at 648); *id.* at 350 (Powell, J. concurring) ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students."). Two decades earlier, the Court held that school discipline is an "area of primary educational responsibility." *Ingraham v. Wright*, 430 U.S. 651, 682 (1977). This applies to procedural as well as substantive decisions about the disciplinary process—because that process, at bottom, is an "educational device." *Goss*, 419 U.S. at 580, 583.

## B.    Holding that Title IX permits retaliation during the Title IX process would turn the statutory scheme against itself

Furthermore, excluding a school's Title IX complaint process from Title IX's scope would defeat the primary reason for an anti-retaliation mandate and subvert the statute's primary enforcement scheme. "Title IX's enforcement scheme depends on individual reporting because individuals and agencies may not bring suit under

the statute unless the recipient has received 'actual notice' of the discrimination." *Jackson*, 544 U.S. at 181. "If recipients were able to avoid such notice by retaliating against all those who dare complain, the statute's enforcement scheme would be subverted." *Id.* at 181. If schools could use the very process designed to handle Title IX complaints to accomplish that retaliation, they could flip the statute's enforcement scheme on its head. Federal Title IX regulations have long required such grievance procedures to be "prompt and equitable." U.S. Dep't of Educ., Final Rule, 45 Fed. Reg. at 30939 (May 9, 1980); *see Jackson*, 544 U.S. at 183 (holding that these longstanding regulations inform the Court's construction of Title IX). A complaint process designed to punish complaints is neither. George Orwell might have thought up such a scheme; Congress surely did not intend it.

### C.    The systemic effects of sex-based discrimination counsel against a narrow definition of "education program or activity"

As a practical matter, excluding the Title IX process from Title IX's scope would undercut protections in virtually all contexts—even in so-called "core" academic functions. If a student suffers sex-based discrimination by another student, *see Davis*, 526 U.S. at 629, or by a faculty member, *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), even during a class, their recourse is generally to engage in their school's Title IX process. If complainants get no protection within that process, others will be even less likely to engage in it to address discrimination in core academic functions. And that reticence could harm not only those

complainants, but all the members of a university community. Colleges and universities often learn of individuals who pose a danger to other students on their campuses through Title IX complaints, so disincentivizing former students from making those complaints leaves other students at risk of future sex-based discrimination. *See*, *e.g.*, U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment, *15 (Updated July 28, 2022) (Even "[i]f a complainant has not filed a formal complaint and is not participating in or attempting to participate in the school's education program or activity," the school may need to act "because the school has a Title IX obligation to provide all students, not just the complainant, with an educational environment that does not discriminate based on sex."); *see Snyder-Hill*, 48 F.4th at 691 (university physician continued to sexually abuse students because school failed to respond to prior student reports).

Besides, sex-based discrimination outside of core academic functions often spills over into core academic functions. *See, e.g., Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) (students stated Title IX claim based on allegations that university's deliberate indifference to rape at fraternity house "caused Plaintiffs to withdraw from participating in educational opportunities … and prevented them from using available KSU resources for fear of encountering the unchecked student-rapists and other students who knew of the rapes"); *cf. Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) ("The school's regulatory

interests remain significant in some off-campus circumstances," which may include "serious or severe bullying or harassment targeting particular individuals.").

Courts of Appeals regularly find potential Title IX liability for schools that fail to address sex-based discrimination outside of core academic functions or even the specific confines of campus. As discussed, this Court has found viable claims based on harassment that occurred in connection with school sporting events and tours of athletic facilities. *See Snyder-Hill*, 48 F.4th at 708. The Fourth Circuit has held that a university could face liability for failing to address sex-based discrimination happening anonymously via a mobile app, where students were posting to the app outside of class time from both on and off campus. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 688 (4th Cir. 2018). The Tenth Circuit affirmed that a university had responsibility to address possible sex-based discrimination at fraternities serving alcohol, far from the school's core academic functions. *Weckhorst v. Kan. State Univ.*, 241 F.Supp.3d 1154, 1168 (D. Kan. 2017), *aff'd* 918 F.3d 1094 (10th Cir. 2019). The Tenth Circuit has also held that a university could face Title IX liability where its football program recruited high school athletes by providing female student "ambassadors" for campus visits, leading to off-campus sexual assaults of some "ambassadors." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1173 (10th Cir. 2007). A school's own Title IX process is far closer to its core academic functions than third-party harassment

through a mobile app, at an off-campus fraternity parties, or during campus tours or athlete recruitment.

## III. The District Court's Error Permitted the University to Take Actions that Would Dissuade Students from Filing Complaints

When a school takes action against a person because she filed a Title IX complaint—especially through the Title IX process itself—its actions constitute retaliation if they would "dissuade[ ] a reasonable [person] from making or supporting a charge of discrimination." *Feminist Majority Found.*, 911 F.3d at 694.[3] The University's actions here certainly qualify. *See* Appellant's Br. at 30-31; Section I.C, *supra*.; *Watford*, 870 F.3d at 450 (delaying or ending post-termination grievance proceeding was adverse).

The University's actions satisfy this standard for all the reasons explained in the Appellant's brief and more. *See* Appellant's Br. at 14. It delayed Jane's hearing for over 15 months, violated its own Title IX policies to benefit the man who raped her on campus, subjected her to impermissible cross-examination about her lawsuit, prevented a University employee from providing critical testimony in her support, and refused to hold her assailant responsible for her on-campus rape, among other things. *Id.* In doing so, it denied Jane the benefits of its Title IX process, including

---

[3] This is consistent with the retaliation standard under Title VII. *Burlington N.*, 548 U.S. at 68; *see Fuhr*, 710 F.3d at 673 n.2 (same standard applies to Title IX).

the rights to a "prompt" school response, to present witnesses at the hearing, and to a fair and impartial adjudication. *See*, *e.g.*, Univ. of Ky. Reg. 6:2 §§ II, VII, IX; *see also id.* § IV(GG) (non-students still have the same rights guaranteed complaints). Just as the employer in *Watford* denied the plaintiff the benefits (including a prompt resolution) of her post-termination grievance process. *Watford*, 870 F.3d at 450.

For the more than half of student sexual assault survivors who take leave or drop out entirely, as Jane Doe did (Appellant's Br. at 3 n.2, 14), these are not empty formalities. The Title IX process and its ultimate outcome have real consequences for complaints. "[S]urvivors who are met with indifference" or disbelief by their school after their assault "predictably suffer increased symptoms of post-traumatic stress and depression, as they will feel betrayed by their community." Ltr. from J.L. Herman to S. Goldberg, Assistant Sec'y for Civil Rights, Dep't of Educ. (Jan. 25, 2019); *accord* U.S. Dep't of Educ., Final Rule, 85 Fed. Reg. at 30043 (May 19, 2020) ("Unsupportive institutional responses increase the effects of trauma on complainants."). Indeed, "[a] fear of being disbelieved or treated poorly is the most common reason given for why a formal report was not made following sexual assault among … college women." C.P. Smith and J. J. Freyd, Institutional Betrayal, American Psychologist 575, 583 (Sept. 2014), *available at* https://dynamic.uoregon.edu/jjf/articles/sf2014.pdf.

Moreover, students who withdraw often rely on the Title IX process to ensure they can return to campus securely. Processes that drag on for years only to reject students' complaints in bad faith understandably make students like Jane Doe "unable to re-enroll in school." Appellant's Br. at 14; *cf. Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1298 (11th Cir. 2007) (holding that student who left school as a result of sexual assault and university's response alleged cognizable injury under Title IX in part because school "did nothing to assuage her concerns of a future attack should she return to UGA").

Thus, the threat that a school will deliberately stall the hearing process for over 15 months, tamper with critical witnesses, then deny in bad faith that the assault ever happened might certainly "dissuade[ ] a reasonable [person] from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

23

## CONCLUSION

For the reasons explained above and in Appellant's brief, this Court should reverse the District Court's judgment and remand for further proceedings.

Respectfully submitted,

/s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

/s/ Sean Ouellette

Sean Ouellette
Adele Kimmel
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net
akimmel@publicjustice.net

Counsel for *Amici Curiae*

Feb. 28, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Rule 29(a)(5) because it contains 5,627 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.66.1, set in Times New Roman 14-point type.

/s/ Jim Davy

Jim Davy

## CERTIFICATE OF SERVICE

I certify that on Feb. 28, 2023 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

**APPENDIX**

# APPENDIX

## LIST OF AMICI CURIAE

**Public Justice** is a national public interest advocacy organization that fights against abusive corporate power and predatory practices, the assault on civil rights and liberties, and the destruction of the earth's sustainability. In its Students' Civil Rights Project, Public Justice focuses on ensuring that educational institutions comply with the Constitution and anti-discrimination laws, including Title IX. Public Justice often represents students denied equal educational opportunities because of sex-based harassment suffered at school, as well as students who experienced retaliation for reporting sex-based harassment. In Public Justice's experience, holding schools accountable under Title IX is critically important to protecting students against discriminatory practices and to ensuring students can obtain their education in a safe environment, free from sex-based harassment and retaliation.

**Atlanta Women for Equality** is a nonprofit legal aid organization dedicated to helping women students assert their legal rights to equitable treatment and equal opportunities and to shaping our education system according to true standards of gender equity. We accomplish this mission by providing free legal representation for women facing gender discrimination in the educational environment—in particular

campus sexual violence—and by protecting and expanding their legal protections and educational opportunities through public policy advocacy.

**Equal Rights Advocates** (ERA) is a national civil rights advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for people of all marginalized gender identities. Since its founding in 1974, ERA has led efforts to combat sex discrimination and advance gender equality by litigating high-impact cases, engaging in policy reform and legislative advocacy campaigns, conducting community education and outreach, and providing free legal assistance to individuals experiencing unfair treatment at work and in school through our national Advice & Counseling program. ERA has filed hundreds of suits and appeared as amicus curiae in numerous cases to defend and enforce gender equity civil rights in state and federal courts, including before the United States Supreme Court. ERA strongly asserts that Congressional intent requires broad and sweeping application of the Title IX prohibition on retaliation in order to effectuate the purpose and intent of Title IX of the Education Amendments of 1972.

Founded in 1916, **Legal Aid at Work** (formerly the Legal Aid Society – Employment Law Center) (LAAW) is a public interest legal organization that advances justice and economic opportunity for low-income people and their families at work, in school, and in the community. For many years, LAAW has represented

female student athletes seeking equal access to sports under Title IX. LAAW spurs schools and park and recreation departments to treat girls equally on and off the field through litigation, technical assistance, training, and legislative advocacy. Focusing particularly on girls of color and girls who live in low-income communities, this work promotes the health, educational achievement, and future employment opportunities of girls. As a result of this work, LAAW is deeply invested in the enforcement of Title IX.

**The National Women's Law Center** (the "Center") is a nonprofit legal organization dedicated to the advancement and protection of women's and girls' legal rights and the right of all persons to be free from sex discrimination. Since 1972, the Center has worked to secure equal opportunity in education for women and girls through enforcement of the Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), and other laws prohibiting sex discrimination. This work includes a deep commitment to eradicating sex-based harassment, including sexual assault, as a barrier to educational success. The Center has participated in numerous cases, including before this Court, other U.S. Courts of Appeal, and the U.S. Supreme Court, to emphasize that the text of Title IX is to be construed broadly and that Title IX's protections apply to all persons whose access to education has been impacted by sex discrimination, including sex-based harassment or related retaliation.

The **Women's Law Project** is a nonprofit public interest legal organization working to defend and advance the rights of women, girls, and LGBTQ+ people in Pennsylvania and beyond. We leverage impact litigation, policy advocacy, public education, and direct assistance and representation to dismantle discriminatory laws, policies, and practices and eradicate institutional biases and unfair treatment based on sex or gender. We seek equitable opportunity in many arenas, including seeking justice for survivors of gender-based violence. WLP is committed to ending violence against women and children and to safeguarding the legal rights of students who experience sexual abuse, including within our schools and universities. To this end, WLP engages in public policy advocacy to improve the response of educational institutions to sexual violence and counsels and represents students who have been subjected to sexual misconduct on our campuses and in our schools. It is essential that schools respond appropriately to sexual harassment and that courts hold them accountable under the applicable law.